**FLORIDA GRAIN & ELEVATOR CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.**

(District Court, S. D. Florida. June 17, 1924.)

No. 1532.

I. **United States** ⊙=52½, New, vol. 19A Key-No. Series—Fleet Corporation held responsible on contracts with shipper.

Respondent, the Emergency Fleet Corporation, entered into contracts with a shipping company, reciting that it was operating a certain steamer, which it employed the shipping company as agent to manage and op-

⊙=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

erate the same. The contract provided that respondent should man, equip, and maintain the vessel in all respects, for the compensation of the shipping company, and authorized it to issue bills of lading in terms prescribed. *Held*, that the fact that the vessel was owned by the United States was immaterial in a suit for damage to cargo, respondent being liable as a time charterer on contracts made by bills of lading issued by its agent.

2. **Shipping ⊙⟶141(1)—Carrier held exempted by bills of lading from liability for damage to cargo caused by prolongation of voyage.**

Where bills of lading authorized the vessel to deviate from the direct route between the ports of shipment and destination, and provided that the carrier should not be liable for "any loss or damage caused by prolongation of the voyage," it is not liable for damage to a grain cargo caused by failure to deliver it within what would have been a reasonable time for a direct voyage.

In Admiralty. Suit by the Florida Grain & Elevator Company against United States Shipping Board Emergency Fleet Corporation. Decree for respondent.

McCollum & Howell, of Jacksonville, Fla., for libelant.

W. M. Gober, U. S. Atty., Tampa, Fla., and Maynard Ramsey, Asst. U. S. Atty., Jacksonville, Fla. (Arthur M. Boal, of Boston, Mass., on the brief), for respondent.

CALL, District Judge. The amended libel in this case charges that the respondent had in its possession and under its jurisdiction and control the steamer Hoosac; that respondent, through its representative and agent, operated the steamer as a common carrier of cargoes between the port of Jacksonville, Fla., and the port of Havana, Cuba; that libelant, having contracted to sell to certain firms in Havana, Cuba, 10,000 bushels of No. 2 yellow corn, upon the representation of the agent of the respondent that the respondent had adequate and ample facilities for the prompt carriage and delivery of said corn to its destination, and would be able to make delivery of the cargo expeditiously. The libelant on the 26th day of August loaded upon the steamer Hoosac 10,000 bushels of No. 2 yellow corn, at the port of Jacksonville, Fla., to be transported to the port of Havana, Cuba, for which three bills of lading were issued and delivered to libelant, the freight charges being prepaid by libelant; that said steamer sailed from the port of Jacksonville, Fla., on September 10th; that said steamer touched at the port of Matanzas, Cuba, September 24th, and remained there until the 17th day of November, when it departed and arrived at the port of Havana in the afternoon of same day; that at the time of the loading of said corn it was good, merchantable corn, of the quality known to the trade as "No. 2 yellow," and that said corn was of such quality that it would have maintained said grade until such time as reasonably ought to have been consumed in the transportation from Jacksonville, Fla., to Havana, Cuba; that upon its arrival in Havana, Cuba, the corn had greatly deteriorated, and bore no merchantable grade, and was refused by the buyers; that at the time when the corn should have reached Havana, September 20th, the market value of corn of the quality of this corn when loaded was $2 per bushel; that upon ascertaining the condition

of the corn upon arrival in Havana, the agent of the respondent at that port, upon the receipt of the bills of lading on the 23d of December, sold the same for $11,337.36; that libelant has suffered a loss, i. e., the difference between the $11,337.36, for which the corn was sold, and the market price on the day when it should have arrived, and claims this amount, with interest at the rate of 8 per cent. on the total value of said corn from September 20th to the time of receipt of the $11,337.-36, to wit, the 17th day of March following, and interest at 8 per cent. on the difference from March 17th to such time as the damages may be paid in full.

The answer admits that respondent was organized under the laws of the District of Columbia, and alleges that the entire capital stock is owned by the United States. It denies that the steamer Hoosac was in the possession and under the jurisdiction and control of respondent, denies that said vessel was held out by respondent as a common carrier of cargoes between the ports mentioned in the libel; denies knowledge of contracts for sale of any corn by libelant; denies solicitation of the freight, and the making of any representation as alleged; denies that the bills of lading were issued by the respondent or its agent; alleges that said bills of lading were issued on behalf of the United States, as owner of the said steamer; admits the sailing of said steamer, arrival at Matanzas, Cuba, and arrival at Havana, as alleged in the libel; denies any knowledge of the quality of the corn; admits the corn was not accepted by the persons notified; denies the market value as alleged; admits said corn was sold for the net sum, as alleged in the libel; denies that libelant is entitled to the amounts claimed in the ninth article of the libel. The answer alleges that the agent making the sale of the corn in Havana was the agent of the owner, the United States.

[1] The testimony was taken, and from it I deduce the facts to be as follows:

In November, 1919, the respondent entered into a "managing agreement," with the Jacksonville Shipping Corporation for the management of the steamer Hoosac. That agreement contains the following; i. e.:

"Whereas, the corporation (meaning the United States Shipping Board Emergency Fleet Corporation) is operating the vessel Hoosac and certain other vessels, and desires to make an agency contract with the manager (the Jacksonville Shipping Corporation) for the husbanding and managing of said vessel," etc.:

"Now, therefore, it is agreed as follows:

"First. The corporation hereby appoints the manager as its agent for the husbanding and managing of the vessel Hoosac," etc.

"Second. The corporation will provide and pay for all fuel, fresh water, stevedoring, port charges, pilotages, agencies, commissions, and consular charges, except those pertaining to the master, officers, and crew, and all other expenses which are usually borne by a time charterer of a vessel."

The agreement then proceeds to set out the duties and responsibilities of the manager and provide for his compensation. The entire language conveys the idea that the manager is responsible to the Fleet Corporation, and to it alone. On the same day an operating agreement was entered into by the Fleet Corporation with the Shipping Corporation for the operation of the vessel, in which the same preamble is used as

in the managing agreement, except that it is for the operation, instead of for the management. This agreement contains the following:

"Second. The corporation will man, equip, victual, and supply the vessel, and provide and pay for all provisions, wages, and consular, shipping, and discharging fees of the master, officers, and crew, and all cabin, deck, engine room, and other necessary stores, and will exercise due diligence to maintain the vessel in a thoroughly efficient state in hull, machinery, tackle, apparel, furniture, and equipment for and during services."

It then sets out the undertakings of the operator as such agent for respondent and provides for his compensation, among which is the following:

"A. Shall issue or cause to be issued to the shippers, customary freight contracts, and bill of lading," etc.

This paragraph contains the language I find in the bills of lading issued to the libelant, excepting from liability for unseaworthiness, provided the owners have exercised due diligence to make the vessel seaworthy.

It is contended that the respondent is not liable to suit because it was acting as agent of the United States Shipping Board; the United States being the owner. This position is not tenable. The libel charges that the respondent was in possession of and operating this steamer. The contracts of management and operation so designate the respondent. In the agreements produced in evidence, the corporation nowhere designates itself as agent, nor does it anywhere purport to be acting for the owner in the capacity of an agent. Nor do I find in the evidence anything that indicates it was acting in a governmental capacity in the making of the contracts and directing the operation of the vessel. The duties assumed by it are those of a time charterer, operating the vessel for the carriage of freight upon certain routes. It can make no difference in the liability of the time charterer that the United States Shipping Board designate the routes. The fact that the bills of lading were signed "by authority of the owners" can refer only to the respondent, the party with whom the contracts of management and operation were made—the party who authorized the operator to issue bills of lading to shippers, and by contract specified the terms of such bills of lading. I am of opinion, therefore, that the suit is properly brought against the respondent.

The issue is made that the Hoosac was not a common carrier of freight. The facts brought out in the testimony, that she was running on a regular schedule between the ports of Jacksonville and the Cuban ports, carrying freight for any one desiring to ship by her for a tariff recognized and understood by shippers, concludes this issue against the respondent.

The libel in this case seeks to recover the difference between the market price of the corn in the Havana market at the time the vessel ought to have arrived expeditiously, and the price at which the corn was sold after the vessel arrived. It is contended that the vessel should have arrived at Havana about September 20th, allowing 10 days for the voyage from the port of Jacksonville to the port of Havana, and testimony was introduced tending to show that that was a reasonable time

to be consumed. Testimony was also introduced showing the market value of the No. 2 yellow corn in the Havana market. This testimony shows that this grade of corn was offered for $2 per bushel on September 20th; that corn was selling on September 18th for $2.07, and on December 28th for $1.39. All above prices were c. i. f. Havana. The contention is made that the quality of the corn, owing to the length of the voyage, had deteriorated until it was unmerchantable, and when sold brought much less than it would have done, had it not been for the deterioration.

[2] Bills of lading were issued, and it is to these bills of lading that we must look for the contract of carriage between the parties. Clause 3 of the bill of lading contains among other things this:

"It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by causes beyond its control; * * * nor from any loss or damage caused by the prolongation of the voyage."

It must be remembered that in the bills of lading provision is made for deviation from the direct route between the ports of shipment and destination. It seems to me that the claim for damages based upon delay, and consequent deterioration by reason of this delay, is covered by this provision of the bill of lading. If it is, the libelant is not entitled to recover in this action.

It is therefore needless to consider the other contentions in the case, such as market values, interest, etc. However, the libel in this case alleges that the corn was sold to parties in Havana, but does not give the price to be paid. Those parties refused to accept delivery on account of the deteriorated condition. Quære, under such conditions, would the market price be the measure of damages, or would not the difference between the amount for which the corn was sold, less freight, insurance, etc., and the amount for which the damaged article was sold, be the measure of damages suffered? However, as beforesaid, in my view above expressed, it is unnecessary to pursue this line of thought further. Clause 9 of the bill of lading might have a controlling effect upon the question, if libelant was in position to claim damages.

The libel will be dismissed, at the cost of libelant.